The government does not dispute that under this Court's decision in U.S. v. Christensen, if the District Court had written suspect that Mr. Burgess suffered from mental or emotional instability, it had the obligation to engage him in an in-depth colloquy to guarantee that he truly understood the consequences of this Pareto waiver of counsel. But the government insists the District Court had no reason to believe that Mr. Burgess suffered from any such mental infirmity. The record proves the government wrong. Before returning to the record, however, I'd like to emphasize that we're not challenging the District Court's finding that Mr. Burgess was confident, that he had the ability to understand the consequences and significance of abandoning a constitutional right. But as the Supreme Court explained in Godinez, a finding that a defendant is confident is not all that's necessary before he may be permitted to waive a constitutional right to counsel. Even after the District Court determined that Mr. Burgess had the ability to understand the proceedings, it still had to make sure that he actually understood the significance and consequences of waiving counsel. The focus of this inquiry is what's in Mr. Burgess's mind, what he understood, not what the District Court said or what it understood. With this in mind, the Court should consider whether the District Court's colloquy with Mr. Burgess was sufficient to guarantee that he actually understood the consequences of waiving counsel. There can be no doubt that the District Court was on notice that despite Mr. Burgess's ability to ultimately understand the proceedings, the understanding wasn't going to come easy. In other words, the District Court should have known significantly more effort would have to be required in Mr. Burgess's case as opposed to the typical defendant before it could guarantee that he actually understood the consequences of waiving a constitutional right. Before the District Court even saw Mr. Burgess for the first time, it received a letter from a pretrial services officer expressing concern over Mr. Burgess's mental state. Among other things, this letter noted that Mr. Burgess acted strangely during a post- indictment arraignment, that the assistant United States attorney on the case expressed concerns over Mr. Burgess's mental health condition, and that Mr. Burgess, quote, failed to make any sense in discussing pretrial service conditions with the pretrial services officer. Also, Mr. Burgess filed two lengthy and rambling pro se documents that had no rational connection to anything in the Federal case, and that's contained in the exertion record. Then at the first hearing before the district judge, when the Court inquired into whether Mr. Burgess wanted to make or proceed without counsel, Mr. Burgess made incomprehensible statements that the Court couldn't understand. Counsel, what do you, in reading this record, it seemed to me that Mr. Burgess was trying to have it both ways, that he had a competency exam and the psychologist found him competent and that he understood the charges and the consequences and all of that, but in court, when he responded to the questions, he didn't, he didn't have a basis for appeal, right, or that even though he was fully competent? Your Honor, I would dispute that vigorously. I think that the evidence of the record showed that Mr. Burgess had, I think, sincere and severe mental difficulties. I don't think he was playing any kind of game. What about the psychologist's report? I think the psychologist's report was, by a BOP psychologist, was directed purely at the question of competency. But if you look at that report, even she doesn't paint Mr. Burgess to be the model of mental health. She says that he, at one point, he wrote a lengthy statement on one of the test questions about his use of purported Treasury Department account. He kept making statements about the UCC, and my lawyer doesn't understand about the UCC. And I think what the crux of the Court's question is, goes to what the Supreme Court determined in Godinez v. Moran, which is where it pointed out there's a difference between competence and then ultimately understanding. A person may be competent, presumably everybody in this courtroom is competent, but on any given subject, some of us may have more, a harder time understanding certain concepts than others. And what this Court said in Christensen was, when a court has information in front of it that any reasonable person would make any reasonable person suspect, okay, this person's a little slow. We've got a report he will ultimately be able to understand, according to the psychologist. But he might not get it simple. We've got to make sure that he really gets it. And I think that what highlights the problem in Mr. — the colloquy with Mr. Burgess is what happened in the first part of the Feretta hearing. At the very first part of that hearing, the Court asked Mr. Burgess if he understood the dangers of self-representation. This is on page 86 of the Excerpts of Record. Mr. Burgess responded, yes, I understand that. So this was not an evasive question. He said, yes, I understand that. At this point, the district court did the right thing. It asked a follow-up question. It said, okay, what do you understand them to be? Significantly, Mr. Burgess's response made it perfectly clear that the district court could not accept at face value his assertions that he understood the consequences of the decision. Here's what Mr. Burgess said when the Court asked him what he understood to be the consequences of self-representation. He said, quote, Well, at this time I could not say exactly the right words. I would have to make notes. Upon further reflection, I would have to take some time to answer that. I don't know the exact type of details involved. Generally speaking, they say that's not a good thing for many various reasons. That was it. Yet despite this clear indication that Mr. Burgess was not truly understanding the things he said that he was understanding, throughout the remainder of the hearing, the district court accepted Mr. Burgess's statements that he understood what the Court was saying without any – without asking any more such probing follow-up questions whatsoever. He just allowed the government to recite the statutory maximum penalty and the elements. The Court itself said – described some of the dangers and pitfalls of self-representation. And the Court said, do you understand all of this? And Mr. Burgess said, as the authorized representative of William R. Burgess, I do. There was a follow-up question, do you have any questions? No, I don't. And then the Court made a statement about the complexity of sentencing and said, do you still want to proceed as your own counsel? Yes, I do. And that was it. That was all that happened during the Feretta hearing. Despite all the irrational pro se filings that the Court had received, Mr. Burgess's bizarre courtroom behavior, and most importantly, that first colloquy when the judge asked the follow-up question and Mr. Burgess wasn't able to articulate the thing he claimed that he completely understood, despite all those factors indicating that Mr. Burgess just wasn't getting it, the Court conducted the most cursory and superficial Feretta hearing possible. Now, that hearing may be fine if any one of us were there trying to waive counsel. But the standard shifts once there's evidence in the record to believe somebody has mental limitations that may – that require a more probing, a more in-depth colloquy between the Court and the defendant to truly make sure he understands the consequences of his actions. What mental limitations do you say he has? He's of normal intelligence, do I understand correctly? According to the psychology report, yes, his IQ range is in the normal range. And he was oriented as to time, place, person, that sort of thing? Yes. He had no mental diagnosis, as I recall. There were no mental diagnoses, but I also do not believe that WP's psychologist was looking for anything besides – Well, she reported that he doesn't have any. I mean, you know, she didn't say I wasn't looking. She said there's no diagnosis on the three axes. So that leaves us with a guy who, as I read, kind of has a wacky view of the law. And take it from me, a Ninth Circuit judge, I get accused of that all the time. I mean, he's got a peculiar view of what – which you recounted in your brief, this theory that a lot of people seem to adhere to. Yes, and then the government says, well, you know, that's fine. A lot of people have this theory. They shouldn't be treated differently than anybody else. I – personally, I think that anybody who comes into a Federal court espousing those beliefs should be viewed as somebody who needs a little bit more explanation than the typical person. I don't think that anybody who's truly rational can think that that is the appropriate way to deal with a Federal case. But I don't want the Court to go – I mean, by taking this asset and using it for money to escape a debt or to get something they want, it's pretty convenient to say, oops, read the UCC. You know, I'm security for this debt now, so you're covered. It's convenient only if you buy into that theory and any rational person would realize – any rational person would realize when Mr. Burgess was buying these cars at the car dealership, giving him – giving forth one of these false U.S. Treasury checks, that they're going to get caught. And certainly, anybody who gets caught – I think the rational person wouldn't accept them. Yeah. I was a little disappointed that I had to bank myself on that one. But like I said, I personally think that anybody with those types of beliefs should be treated with kid gloves. But I don't think the Court has to go that far. I think that here, the stuff in the record, the rambling, crazy pro se filings, the statements in court that made first the magistrate and then the district judge saying, you know what, I don't know what you're saying, so, you know, I guess I'll just have to enter a not guilty plea for you. I just don't understand. All that, I think, was – all we're asking is that it creates a just a – a slightly higher burden on the Court to just ask those kind of probing questions, like the district court asked in the first place. You know, we're asked to follow up questions. Thank you very much, Mr. Laughlin. May it please the Court. Eric Silber on behalf of the United States. The district court here made a finding. The defendant understood the dangers and disadvantages of representing himself, and the waiver was knowing and intelligently – the defendant knowingly and intelligently waived his right to counsel. And those findings are supported by the record in this case. I think it's important to start and look at what happened at the October hearing, which was the first appearance before the district court in this case. Well, your opponent relies heavily on the defendant's response to the danger – question about dangers of self-representation. And he says exactly what your opponent says he said, and never did say, really, that he did understand. And your opponent said right then and there, the district court had an obligation to probe further. How do you respond to that? Well, I disagree that that – what happened at that point in time shows that there was anything wrong with what the district court did here. I think it's first important to look at what point in time in the hearing that happened. That happened before the district court had explained the dangers and disadvantages of representation to the defendant. All that happened at that point was the district court asked the defendant whether defense counsel had explained these dangers to the defendant. And this court relied on that fact in Alt to support the kind of finding that it was knowing and intelligently waived when defense counsel had explained it. So the district court was inquiring into that. Now, the defendant did understand that there were dangers and disadvantages to representing himself. He just didn't know the specifics of it. In Iowa v. Tovar last term, the Supreme Court indicated that what the defendant has to know when waiving his rights is the general rights, not the specific rights. So what you have at that point of time, although the defendant couldn't identify the specific dangers, he did indicate a knowledge of the general dangers. And it's important to look at what happened after that. That's when the district court went through the dangers for him. The district court kind of gave a combination of dangers. It gave specific examples. It talked about how the defendant would have to know the federal rules of evidence, how an attorney would be more familiar with defense strategy, and would be more familiar with kind of viable defenses and things like that. And the court also gave kind of a more colloquial answer, which was, I don't believe I've ever had a defendant who prevailed when representing himself. And this court indicated in Lopez v. Thompson that such kind of more colloquial answers can, in fact, be more effective. There, the district court said to the defendant, if this is how you're going to represent yourself, you're putting the noose around your own neck. And this court indicated that that would bring home the point perhaps more than other information. I think that's what the district court said here would do. So, I mean, the district court indicated, based on the district court's history, that the defendant was going to lose. It suggested that was likely if the defendant did that. And I think that was likely to hit home the point more than listing specific examples. I mean, I think it's also important to look at the context of this conversation in light of the October conversation. That conversation in October was a back and forth between the district court and defendant. There were no yes, no answers, or primarily not yes, no answers in that circumstance. Instead, the district court was inquiring why the defendant hadn't shown up to pretrial supervision, why there had been a suggestion he had been hostile. The district court went into kind of his employment history, where he was living, things like that. And the defendant was required to explain himself. And the district court, after doing all of that, found that the defendant did understand what the district court was saying. And, in fact, the district court's conclusion based on that hearing, and, again, this is the first interaction the district court had with the defendant, was that the defendant was probably competent. Now, the district court indicated it wasn't 100 percent sure about that. And that was based upon some of the things the defendant was saying. Now, on appeal, the defendant recognizes that these types of statements are consistent with kind of a UCC redemption theory. But there was no statement to the district court about that at the time. And because of that, the district court, as I said, indicated it wasn't 100 percent sure about the defendant's competence. And it wanted to order a competency exam to be sure. And the court did that here. And the exam came back and said that the defendant suffered from no mental health diagnosis. I mean, it wasn't simply that he was — had a diagnosis but was competent at trial. It was — or the medication somehow could treat it and he would be able to go. It was simply that there was no diagnosis. And that medical evaluation simply confirmed what the district court had already determined on its own. So, given that — I mean, there's no basis in the record to suggest that the defendant did not, in fact, understand the dangers and disadvantages of representation, which is the ultimate inquiry here. I mean, the ultimate question is what the defendant understood. It's not what the district court said to him. And there is no suggestion in this record the defendant didn't understand that. And, in fact, I think what the district court did — I mean, defendant's argument is essentially that the district court should have treated the defendant with tip gloves on these kind of statements that the defendant was making that raised questions. But I think the district court did the appropriate thing in the face of that, which was to ask for the competency evaluation. And what the court got back was the no mental health problems, the high average intelligence, the mental health evaluation indicated that the defendant can understand things when they're explained to him. So, at that point, there was no heightened inquiry required. Did he ask for a supplemental briefing on the Blakeley issue, the loss calculation? Yes. To the amount of — it seemed to me there were — in the pre-sentence report, there was one amount of loss that I guess he was found guilty of. And then two other amounts of loss, which were taken into account as relevant conduct. And the jury did not make a finding on that. He didn't admit it. So does that present the Blakeley-Omeline issues? I think there is a Blakeley-Omeline issue here. I would — the defendant — as defense counsel indicated in his 28-J letter, the defendant is now out on bond, pending, really, because of a Blakeley issue. And I think given that, as this court indicated in Castro, I think the better practice at this point of time would be to defer deciding the issue until after the Supreme Court has ruled in Booker and Fanfan. I don't think it would make sense at this point to decide the issue. I mean, there is an actual issue there. I mean, the jury — the district court at sentencing was required to make a factual finding that was not presented to the jury. So there is a question under Blakeley and Omeline. I mean, the argument that got represented was that it wasn't plain error. But I think in the interest of judicial economy, it would make more sense to defer — There's no reason — excuse me, you're not saying remanded, are you? No, I'm not saying remanded. Oh, he's out on bail. I'd say simply wait to decide this issue — this court to wait to decide this issue until after the Supreme Court has ruled on it. I mistook the citation to Castro as a request for a remand, because — I apologize. I mean, the court there also, when it talked about supplemental briefing, indicated that unless there were other issues raised, it wouldn't make sense to have supplemental briefing for other issues like you were going to fully serve your sentence. Now, there already has been supplemental briefing here, obviously, but the same rationale would apply to simply staying decision in a case in which it's already been briefed. The — I think it was $100,000. What was the difference in time that he would serve based on the offensive conviction as opposed to the increase by virtue of the loss calculation? You know, I'm not — take me just one second. He was at level — the judge sentenced him at a level 18, and if I understand it right, if Mr. Laughlin succeeds, it would go down to a level 14. Does that sound — That sounds correct. I mean, obviously, I believe the only extra amount he got was under 2B1.1 for the amount of loss. Just take me a second, Your Honor. See, I believe that's — well, I believe that my calculation would be that he would go from 18 to a 14 in this circumstance. At 14, the maximum he could get would be 21 months, and under 18, the minimum he could get is 27 months. So theoretically, they're — right off the start, there's a six-month advantage to him, if I got this figured out right. I mean, I do think it — as the district court, regardless of what the actual math winds up being, I mean, I think the district court did grant bond because it was concerned the defendant was going to fully serve his sentence, and that if he prevailed on the Blakely issue, it would be kind of an empty victory for him because he would have served the sentence, and so the district court took the action to let the defendant. And I think that's a good thing. I think the district court did a good job of getting the defendant out of custody. And having done that, I mean, I really think this issue would be better addressed at that time. I mean, if necessary, based on what happens in Booker and Fan Fan, we can submit a supplemental briefing that discusses the effect of that, depending on the result. And I mean, we already have laid out kind of the view of both sides of whether there was or was not plain error. If there's something else that results coming out of the Supreme Court's decision, maybe it would make sense to address it at that time. But at least it would be helpful to have the Supreme Court's decision. We didn't discuss acceptance of responsibility. If the panel has any questions on that, I'd be happy to answer it. But otherwise, the government submits. Thank you very much, Mr. Silver. Mr. Rothman, we'll give you a minute. Thank you, Your Honor. Briefly, on the issue of the Feretta waiver, I would just encourage the Court to just look carefully at the pro se filings, at his statements during the hearings. And even though this other stuff happened after the Feretta hearing, look how he was through trial. This is not somebody who was very swift. He's not somebody who wanted to represent himself so he could use it as a forum to put forth a series. It's unclear what he wanted. And I think that it shows his confusion by doing nothing at trial that he really didn't understand what was going on. And the second point I wanted to make was about the acceptance of responsibility. The one clear statement he did make at trial is when he stood up in front of the judge and the jury and said the defendant pleads guilty and accepts all and doesn't contest any of the facts in this matter. He never did anything after that point that would negate that clear acceptance of responsibility. And I think that the Court's unreasonable failure to give him acceptance simply because he didn't repeat a statement at the sentencing hearing itself amounts to clear error, which should be reversed. Thank you very much. Thank you. Thank you. Thank you to both counsel. The matter just argued is submitted. We'll stand in recess for the week. All rise. The court is in recess for the week.
judges: T. G. Nelson, Silverman, Wardlaw